IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| ISAIAH LLOYD, | ) | |
| | ) | Case No. 16 CV 7475 |
| Plaintiff, | ) | |
| | ) | The Honorable Rebecca Pallmeyer |
| v. | ) | Judge Presiding |
| | ) | |
| CHICAGO POLICE OFFICER | ) | |
| ROCCO PRUGER, STAR #15445, et al., | ) | The Honorable Sheila Finnegan |
| | ) | Magistrate Judge |
| Defendants. | ) | |

**PLAINTIFF'S RULE 56.1(B)(3)(c) STATEMENT OF ADDITIONAL FACTS THAT REQUIRE THE DENIAL OF SUMMARY JUDGMENT**

Now comes the Plaintiff, ISAIAH LLOYD, by and through his attorneys, LAW OFFICES OF JEFFREY J. NESLUND and ROBERTSON DURIC, and in support of his opposition to Defendant's Motion for Summary Judgment, submits the following undisputed material facts:

**Robbery of Lauren Bridger**

1.  Lauren Bridger saw the person that robbed her on July 24, 2014, for about 5 to 6 seconds. (Pltf. Ex. A, Crim. Tr. Tx., p. 37:7-10).

2.  Lauren Bridger's focus was on the weapon after it was pulled out from the offender's zipped hooded sweatshirt. (Pltf. Ex. B, Bridger dep., p. 23:5-19; p. 161:7-12).

3.  Abraham Oshel saw the offender get into a red car and flee the scene after the robbery, but did not see his face and could not identify him. (Ex. G, Det. Grzenia dep., pgs. 34-35:1-13).

4.  Defendant Pisano, a CPD Detective working overtime as a patrol officer, was the first officer to respond to the scene of the robbery and put Lauren Bridger's description over the radio that the offender was a male black in a jogging suit in a red vehicle. Defendant Pisano

1

explained over the radio: "*All she was paying attention to was the gun; that's all she can give us.*" (Pltf. Ex. C, OEMC audio at 3:35; Ex. B, p. 160, 15-19; p. 161:7-12).

5. Lauren Bridger's boyfriend, Kyle Sowards, was able to "ping" Ms. Bridger's phone with his laptop and track it to a BP gas station. (Pltf. Ex. B, p.36:9-16).

6. Defendant Pisano drove Bridger and Sowards to the BP gas station and told officers over the radio that they were going to continue to ping Ms. Bridger's stolen phone. (Ex. C, OEMC audio at 7:37; Pltf. Ex. B, p. 43:9-13).

**Recovery of Robbery Proceeds from Tajuana Bloodworth's red Chevy Impala**

7. Defendant Officers Pruger, Theodore and Cox were working together in a 3-man unmarked car and monitored the radio transmissions from Defendant Pisano and responded to the BP gas station. (Pltf. Ex. D, Pruger dep., p. 23:9-20; p.28-30:1-4).

8. Defendant Officers Pruger, Theodore and Cox observed a red Chevy next to the pumps in the BP gas station with the engine running. (Pltf. Ex. D, Pruger dep., p.32:14-24, p. 33:1-18).

9. People fled the BP gas station as Defendant Officers Pruger, Theodore and Cox drove into the gas station. (Pltf. Ex. D, Pruger dep., p. 135:8-11; Pltf. Ex. I, dep. of Isaiah Lloyd, p. 155:19-24).

10. Defendant Officers Pruger, Theodore and Cox observed and recovered Lauren Bridger's purse, cell phone and a pellet gun from the passenger seat of the Red Chevy Impala. (Pltf. Ex. D, Pruger dep., p. 36:2-18; p. 40:19-23; Pltf. Ex. L, Cox dep., p. 22:20-24; p. 23:1-10).

11. Defendant Officer Pruger ran the VIN number and license plate number for the red Chevy Impala and knew that it was registered to Tajuana Bloodworth, who resided at 3246

2

W. 139th St, unit 1A, in Robbins IL. (Ex. E, OEMC Event Query, CCSAO #337; Pltf. Ex. D, p. 63:9-24, p. 64:1-8).

12. Officer Pruger filled out the tow report listing Tajuana Bloodworth as the owner of the red Chevy Impala and that the ownership was verified. Pruger also checked a box on the tow report that the vehicle was to be held for investigation. (Ex. F, Tow Report, Pltf. Bt. # 20).

13. Defendant Officer Pruger expected the follow- up detective to interview Ms. Bloodworth because it was important to know to who had her car at the time of the robbery. (Pltf. Ex. D, p. 79:10-22; p. 129:2-15).

14. Detective Grzenia, the sole Chicago Police Department Detective assigned to the investigation of this case and responsible for all follow-up investigation, never attempted to interview Ms. Bloodworth to find out who had her vehicle at the time of the robbery. (Pltf. Ex. G, dep. of Det. Grzenia, p. 13:12-20; p. 83:8-16).

15. After Tajuana Bloodworth's red Chevy was towed by the Chicago Police Department for "investigation," she recovered her vehicle from the pound without ever being interviewed or contacted by Detective Grzenia. (Pltf. Ex. A., p. 118-119; Pltf. Ex. G, p. 75:8-15).

16. Tajuana Bloodworth's boyfriend, Jason Johnson, had her red Chevy on the night of the robbery and fled the gas station when the police arrived. (Pltf. Ex. A , Crim Tr., p. 115).

**Detective Grzenia falsely claims Plaintiff was the owner of the car used in the robbery**

17. Defendant Stephen Grzenia has been a Chicago Police detective for 14 years and a police officer for 20 years at time of this incident and has worked on hundreds of robbery cases. (Ex. G, p. 6:2-7; p. 8:18-21).

18. Detective Grzenia stated that he wanted to do as complete and through an

3

investigation as possible; Grzenia never spoke to the arresting officers and only relied on the arrest and incident reports to "some extent" and calls victims and re-interviews them because "sometimes things get lost in translation… errors, could be a lot of things." (Ex. G, p. 11:8-11, p. 23:13-23).

19. Detective Grzenia knew from reviewing the Incident Report that the proceeds from the robbery and the pellet gun were all recovered from the red Chevy at the gas station and Mr. Lloyd was never seen in that car. (Pltf. Ex. G, p. 81:15-24, p. 82:1-9).

20. Detective Grzenia initially denied, but then admitted, that he knew the red Chevy Impala was owned by Ms. Bloodworth because he ran the VIN number through a CPD database called the "Hot Desk." (Pltf. Ex. G, p. 69-71).

21. The "Hot Sheet Desk" Inquiries show that on July 25, 2014 at 12:37 p.m., prior to calling the Felony Review Unit, Det. Grzenia accessed the "Hot Desk" database and knew the owner of the Red Chevy Impala was Tajuana Bloodworth with an address in Robbins, Illinois. (Pltf. Ex. G, p. 69-71; Pltf. Ex. M, Hot Desk Search Inquiry FCRL 001231).

22. Detective Grzenia's wrote in his Closing Supplemental Report that Isaiah Lloyd was the "owner" of the red Chevy when he knew the actual owner was Ms. Bloodworth. (Def. Ex. E, Det. Grzenia's Closing Supplemental Report, p. 2, FCRL 00006).

23. Det. Grzenia admitted that during his investigation and prior to the presentation of the case to the prosecuting authority, he must have known that Isaiah Lloyd was not owner of car and that the vehicle was owned by Ms. Bloodworth. (Pltf. Ex. G, p.71:14-24).

**Detective Grzenia falsely tells the Felony Review Prosecutor that the proceeds from the robbery and the gun were recovered from the Plaintiff's car**

24. Detective Grzenia called the Cook County State's Attorney's Office Felony Review Unit to seek felony charges of aggravated robbery against Isaiah Lloyd around 2:00 p.m.

4

on July 25, 2014. Detective Grzenia was the only person to speak to the Felony Review ASA and all information to the prosecutor's office came from him. (Pltf. Ex. G, p. 94; p. 102:8-15; Ex. H, ASA Yassan dep., p. 46:17-21).

25. ASA Andrew Yassan spoke to Grzenia over the phone, created a Felony Review Fact Sheet, and made his determination as to whether to approve felony charges all based on what he was told by Detective Grzenia. (Pltf. Ex. H, p. 18:4-16; p. p.25:10-21; p. 46:17-2; p. 49:9-13).

26. Det. Grzenia did not tell ASA Yassan anything about the robbery proceeds and weapon being recovered from Ms. Bloodworth's red Chevy Impala. (Pltf. Ex. H, p. 43:7-22).

27. ASA Yassan's understanding based on what he was told by Det. Grzenia was that the proceeds from the robbery and the pellet gun were recovered from Isaiah Lloyd's cousin's vehicle and that Isaiah Lloyd made a statement that "he had no idea how the items got into his cousin's car." (Pltf. Ex. H, p. 42, p. 43:1-6).

28. Isaiah Lloyd never made any such statements to Det. Grzenia about the robbery proceeds, the weapon or his cousin's car. Isaiah Lloyd denied any knowledge or involvement with the robbery to Det. Grzenia. (Pltf. Ex. G, p. 38).

29. Detective Grzenia did not have any information that Isaiah Lloyd had any connection whatsoever to Ms. Bloodworth's red Chevy Impala where the robbery proceeds and pellet gun were discovered. The Incident Report by Defendant Pruger reviewed by Det. Grzenia only states that Isaiah Lloyd was "standing in the BP gas station." (Pltf. Ex. G, p. 69-71; p. 82:6-22).

**Isaiah Lloyd is placed in an improper and suggestive line up at the gas station**

30. When Defendant Officers Pruger, Theodore and Cox arrived at the gas station,

5

Isaiah Lloyd was in a van with his cousin, Brandon Williams, as well as Hubert Gibbs, Jeremy Wright and Tywon Underwood. (Pltf. Ex. I, Isaiah Lloyd dep., p. 58:14-24, p. 59, p. 60:1-19; p. 163:8-11).

31.     Isaiah Lloyd was pulled out of the van by Defendant Officers Theodore and Cox. Brandon Williams, Hubert Gibbs, Jeremy Wright and Tywon Underwood were also forced out of the van and handcuffed by Defendant Officers Pruger, Theodore and Cox. (Pltf. Ex. I, p. 64:16-22; p. 85:7-8; Pltf. Ex. A, Crim Tr. - Hubert Gibbs, p. 129:12-24; Pltf. Ex. L, dep. of PO Cox, p. 21:5-15).

32.     Before going to the station with Defendant Pisano, Lauren Bridger was told by the police that they caught the person who robbed her "red-handed with her stuff." (Pltf. Ex. B, p. 153:5-9; p. 77:8-16; p. 172:23-24, p. 173:1-7).

33.     When Lauren Bridger arrived at the gas station she saw police searching the van with a group of guys in handcuffs sitting behind Mr. Lloyd who was standing. (Pltf. Ex. B, p. 47:4-9; p. 52:16-24, p. 53:1-3; p. 151:11-18).

34.     The police said in the car before Sowards and Bridger arrived at the gas station that they had already apprehended the offender and recovered Bridger's possessions from a van. (Pltf. Ex. J, dep. of Kyle Sowards, p. 18:6-11; p. 19:1-8).

35.     According to Kyle Sowards, when they arrived at the gas station three police officers were searching the van. Sowards was asked by the police to ping Bridger's phone again and the police then acted like they recovered Bridger's purse and phone from the van. This all occurred in Bridger's presence and before she was asked to make any identification. (Pltf. Ex. J, p. 21-24: 7-10; p. 26:1-4; p. 57:18-22).

6

36. Lauren Bridger was shown her possessions and assumed they were recovered from the van where the police had Isaiah Lloyd and the other men in custody. (Pltf. Ex. B, p.167:1-5).

37. When Lauren Bridger saw Isaiah Lloyd, he was the only person standing up with police around him and the four other men were behind him handcuffed on the ground. (Pltf. Ex. K, Preliminary Hrg. Tr., p.11-12; See also Ex. B, p. 151:11-15; Pltf. Ex. N, Affidavit of Lauren Bridger ¶ 17).

38. Defendants Pruger and Cox admit that if Isaiah Lloyd was the only person standing and the other men were on the ground behind him, that would be an improper and suggestive identification procedure. (Pltf. Ex. D, 58:8-12; p. 137:7-15; Pltf. Ex. L, p. 46).

39. Defendant Grzenia admits that if Isaiah Lloyd was the only person standing and others were on the ground behind him, that would be an improper and suggestive identification procedure. (Pltf. Ex. G, p. 125:18-24, p. 126: 1-2).

40. After about an hour at the gas station, Lauren Bridger was asked to make an identification through the back seat window of the squad car that had a metal cage or panel over it. Ms. Bridger did not have a "super clear view" and questioned the officers if this was the correct way to make an identification. (Pltf. Ex. B, p. 66:18-24, p. 67:1-12; p. 150, 151:1-4; p. 152:9-13; p. 172:1-10).

41. According to Lauren Bridger, the other men in handcuffs all had dreadlocks and Isaiah Lloyd was the only person with short hair. (Pltf. Ex. B, p. 153:11-17).

42. According to Detective Grzenia, it would be improper and suggestive to place one person with short hair in a line up where everyone else had dreadlocks. (Ex. G, p. 55:22-24, p. 56:1-6).

7

43. Lauren Bridger made her identification mainly on hairstyle. (Pltf. Ex. B, p. 69:4-6).

44. Lauren Bridger went to the police station for a long time after the gas station, but was never asked to view a line-up, photo array or any other identification procedure to make sure she could identify the person who robbed her. (Pltf. Ex. N, Affidavit of Lauren Bridger ¶ 21; Pltf. Ex. B, p. 91, 94, p. 95:1-2).

45. Lauren Bridger does not recall speaking with Detective Grzenia, never signed any criminal complaints, and never told anyone she wanted to pursue criminal charges against Isaiah Lloyd. (Pltf. Ex. B, p. 96: 13-16; p. 97:11-20).

46. Detective Grzenia never interviewed Lauren Bridger in person and only spoke to her on the phone; he never asked her to view a line-up, photo array, or participate in any other identification procedure. (Pltf. Ex. G, p. 23; Pltf. Ex. N, Affidavit of Lauren Bridger ¶ 21).

47. Detective Grzenia had no information on how the identification procedure took place at the gas station and had no information on the height, weight, or hair style of any of the participants. (Pltf. Ex. G, p. 41:14-19; p. 52:7-13; p. 124:20-24, p. 125:1-17).

48. If the identification at the gas station was improper or suggestive, there was no other physical evidence to connect Isaiah Lloyd to the robbery. (Pltf. Ex. D, p. 136:8-15).

### Det. Grzenia ignores Plaintiff's alibi

49. Isaiah Lloyd told Detective Grzenia that he had nothing to do with the robbery and that he was with his cousin, Brandon Williams. Isaiah Lloyd also told Detective Grzenia that he lives with his mom, Belinda Brownlee, and provided her address to him. (Pltf. Ex. G, p. 38).

50. Detective Grzenia made no effort to contact Plaintiff's cousin or mother regarding his alibi. (Pltf. Ex. G, p. 45:1-13; p. 47:20-24, p. 48:5).

51. On July 26, 2014, Isaiah Lloyd had a bond hearing and his bond was set at $150,000.00. Mr. Lloyd did not have the financial resources to bond out of jail. (Pltf. Ex. I, p. 119).

52. Plaintiff remained in Cook County Department of Corrections until November 10, 2015, when he was found not guilty of all criminal charges sought by Detective Grzenia. (Def. Ex. A, Plaintiff's Second Amended Complaint, ¶ 26).

                                                  Respectfully submitted,

                                                  /s/Jeffrey J. Neslund
                                                  JEFFREY J. NESLUND
                                                  One of Plaintiff's Attorneys

Jeffrey J. Neslund
Law Offices of Jeffrey J. Neslund
20 N. Wacker Drive, Suite 3710
Chicago, IL 60606
(312) 223-1100

Robert Robertson
Robertson Duric
One N. LaSalle Street, Suite 300
Chicago, IL 60602
(312) 223-8600

## CERTIFICATE OF SERVICE

I, **Jeffrey J. Neslund**, an attorney, hereby certify that on **October 25, 2018**, I caused the **PLAINTIFF'S RULE 56.1(B)(3)(c) STATEMENT OF ADDITIONAL FACTS THAT REQUIRE THE DENIAL OF SUMMARY JUDGMENT** to be served via the Court's ECF electronic filing system to the following:

Scott A. Cohen
Allison L. Romelfanger
Iris Y. Chavira
City of Chicago Department of Law
30 N. LaSalle Street, Suite 900
Chicago, IL 60602


Respectfully submitted,

/s/ Jeffrey J. Neslund
Jeffrey J. Neslund