IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ISAIAH LLOYD, )
)
Plaintiff, )
)
- vs - ) 16 CV 7475
)
CHICAGO POLICE OFFICER ROCCO )
PRUGER, STAR #15445; CHICAGO ) Judge Pallmeyer
OFFICER PETER THEODORE, )
STAR #10523; CHICAGO POLICE ) Mag. Finnegan
OFFICER BRYAN COX, STAR #19328; )
CHICAGO POLICE DETECTIVE KENNETH)
PISANO, STAR #20205; CHICAGO )
POLICE DETECTIVE STEPHEN GRZENIA)
STAR #20710; OTHER UNKNOWN )
CHICAGO POLICE OFFICERS; LAUREN )
BRIDGER; and THE CITY OF CHICAGO)
a Municipal Corporation, )
)
Defendants. )

The Discovery Deposition of

OFFICER ROCCO PRUGER

taken in the above-entitled cause, before BERNA DAVIS, a Certified Shorthand Reporter in the State of Illinois, taken at The Law Offices of Jeffrey J. Neslund, 20 North Wacker Drive, Suite 3710, Chicago, Illinois, 60606, on the 14h day of June, A.D., 2017, commencing at approximately 10:58 a.m.

Pltf's Ex. D

jail?
A **Yes.**
Q Okay. I mean, you don't have a memory of taking the jacket, or keeping the jacket -- sweatshirt and doing something with it?
A **No.**
Q All right. And if Mr. Lloyd was in fact wearing the hooded sweatshirt, that would be consistent with the information you heard over the radio, that the offender was wearing a hoody?
A **Yes.**
Q Okay. This testimony that you gave at the criminal trial about Mr. Lloyd wearing a hooded sweatshirt, that wasn't a fact that you fabricated; was it?
A **I'm sorry. Can you repeat the question?**
Q Sure. Your testimony at the criminal trial that Mr. Lloyd was wearing a hooded sweatshirt at the time he was identified, was that something you fabricated?
A **No.**
Q That wasn't something you made up in an effort to get Mr. Lloyd convicted in the criminal case; was it?

A **Absolutely not.**
Q Are you aware that the prosecutors stipulated and agreed in front of the jury, and informed the jury, that Mr. Lloyd was not in fact wearing a sweatshirt on July 24th, 2014?
A **I'm not aware of that.**
Q No prosecutor ever told you that?
A **Not that I believe. No.**
Q Okay. All right. Back on July 24th, 2014, around 1:13 p.m. what was your assignment?
A **I was assigned to Gang Enforcement Division.**
Q And who were you working with?
A **On that day I was working with Officer Cox. That's C-o-x. And Officer Theodore, T-h-e-o-d-o-r-e.**
Q All right. You were in a three-man car?
A **Yes, sir.**
Q It was an unmarked car?
A **Yes.**
Q All right. No dash cam in it?
A **No.**
Q Okay. And there's two other names that appear on the report. Let me ask you, Officer

David Salgado and Roberto Ramirez, were they members of your team?
A **They were members of my team, yes.**
Q Were they present for the identification procedure?
A **They did show up on scene, but I do not recall if they were there for the identification scene or after.**
Q Okay. They came at some point to the gas station?
A **I believe so.**
Q All right. I'm going to fast forward a little bit. When the victim comes to the gas station and -- that's this Lauren Bridger -- to make an identification did you ever speak to Ms. Bridger at the gas station?
A **No.**
Q Did you ever speak to the officers that brought Ms. Bridger to the gas station?
A **Yes.**
Q All right. And let's talk about that. Did you go to the squad car or did the officers get out of the squad car?
A **I believe the officers got out of their**

**squad car, and then I think -- I believe I walked up to them and talked to them.**
Q All right. Do you remember, was it one officer? Two officers? Do you remember how many got out of the squad car?
A **Two officers.**
Q Do you know if they were in uniform?
A **Yes.**
Q And what did you say to them and what did they say to you?
A **Initially I believe we had a conversation about how the phone was pinging to the gas station. The victim's phone, Lauren Bridger. And then I believe we had a discussion about how myself and my partners might have a possible offender.**
Q Okay. At the time you spoke to these officers had you already seen the proceeds that were in this red car that was in the gas station?
A **Yes, I did see the proceeds before speaking to the officers.**
Q Okay. Did you go and look through the --
There was a purse that was in

the red car; is that right?
A **Yes.**
Q All right. Before Ms. Bridger arrived, did you look at the purse and see if there was any identification within the purse?
A **I don't believe so.**
Q Okay. So you heard the phone pinging. And that was in the red car, the phone that was pinging?
MS. BENSON: Objection; mischaracterizes his testimony.
Go ahead and answer.
THE WITNESS: The phone was in the vehicle. I can't remember if it was still beeping or not -- if it was still pinging.
BY MR. NESLUND:
Q All right. Besides yourself, Officer Theodore or Cox, were either of them present for the conversation you had with the officers that brought the victim to the gas station?
A **I don't recall.**
Q Okay. Did you inform the officers that you spoke with -- and I'm talking about this initial conversation when they first get there --

that you saw the proceeds in the red car from the robbery?
A **I think at some point I had told them that that, I found -- at the time I didn't know if there were proceeds or not. But I found what I believed to be a weapon at the time, a couple -- two cell phones, I believe, and then a purse with keys on them.**
Q Do you know if you told them that before or after the identification procedure?
A **I think I told them before.**
Q Okay. All right. Let me back up. Before you get to the gas station, do you monitor this call of the armed robbery that had taken place?
A **Yes. I'm monitoring my radio.**
Q Okay. And there was a description that was put out over the air by the officers that first met with Ms. Bridger; correct?
A **Yes.**
Q And have you listened to that recently? Do you know what that description was that went out over the air?
A **I have not listened to any**

**transmissions. I don't remember the exact description given.**
MR. NESLUND: That's all right. Let me see if I can pull it up here. Let me play it for you and then just ask you some questions about this.
THE WITNESS: Sure.
MR. NESLUND: Off the record.
(WHEREUPON, the parties went off the record.)
MR. NESLUND: For the record, I'm going to start the OEMC recording at 1:27. I think the description comes in in about 10 seconds. Let me put this over here. This is as loud as it gets. I'll play it then I'll stop it, then I'll ask you some questions.
(Audio playing.)
BY MR. NESLUND:
Q I'm going to pause it there at 2:27 on the counter.
(Audio paused.)
Officer, so is that the description that you monitored on your radio as far as a possible offender for this robbery?

A **Yes.**
Q Male, Black, jogging suit, armed, possibly red vehicle; correct?
A **Yes.**
Q There was no specific, like, height or weight or anything else; correct?
A **Not at that time, no.**
MR. NESLUND: Okay. All right. Let me fast forward it to the next one. All right. I'm going to play it at 3:10 on the counter, and I think it comes in at around 3:35.
(Audio playing.)
BY MR. NESLUND:
Q All right. Let me stop there.
(Audio paused.)
The counter, for the record, is at 3:56.
So was that also the description that you monitored that evening, male, Black, tall, lean, bald headed?
A **Yes.**
Q And, again, there wasn't a specific height or weight description; correct?
A **Correct.**

Q All right. So based on these transmissions that we just played, you and your partners proceeded to the gas station; right?
**A Yes.**
Q Once you arrive at the gas station --
By the way, do you remember who was driving your car by any chance?
**A I believe I was driving that day.**
Q Okay. All right. When you get to the gas station do you recall if you had any emergency lights or sirens?
**A I don't recall if my lights were activated or my siren was activated.**
Q Okay. This gas station -- and it's on, I believe, the corner of Harrison and Independence. Do you remember which street you entered the gas station from?
**A I entered the gas station off of Independence.**
Q All right. And when you entered the gas station where did you drive your car to?
**A To the -- it would be like the parking lot area where the gas pumps are.**
Q And do you remember where you parked the



car within the gas station?
**A I would say approximately 5 to 10 feet behind the red vehicle that was parked at the gas pumps.**
MR. NESLUND: All right. Let me show you --
We'll mark this as Exhibit 2.
(Exhibit No. 2 was marked for identification and tendered to the witness.)
BY MR. NESLUND:
Q Okay. Looking at Exhibit 2, do you recognize that as a picture of the gas station?
**A Yes.**
Q And take the sharpie, and if you could just put a little box where you parked your car.
**A I believe it was in this area.**
**(Witness complies.)**
Q And let the record reflect Officer Pruger has placed a box with the sharpie on the right side of the photograph.
Is that correct?
**A Yes.**
Q And this (indicating) of course is



Independence at the bottom. That would be where Independence is?
**A Yes.**
Q Okay. And Independence goes north-south; correct?
**A Yes, sir.**
Q All right. And where --
I guess 290 is off to the left of the photograph?
**A 290 is just north of the gas station.**
Q All right. And the street that is north of the gas station is Harrison?
**A Yes, sir.**
Q All right. And you mentioned the red car at the pump. Can you put a circle around the approximate area where you saw the red car?
(Witness complies.)
Q All right. Let the record reflect Officer Pruger has placed a circle in the approximate location of the red car. Actually, circling, like, a silver car that's in the photo; correct?
**A Yes, sir.**
Q And this red car, the engine was running



when you first saw it?
**A Yes.**
Q All right. And it was -- I get my directions confused.
This is which direction in relation to the pump? This would be south, south, the pump?
**A Yes.**
Q Okay. All right. Now, is there --
Were there two pumps at this particular, I guess island, like most gas stations?
**A Yes.**
Q All right. Was the red car at the pump closer to Independence or farther away?
**A The pump --**
**The red car was parked on the south side of the pump.**
Q Okay. But would it be farther east or west of the red car, if that makes sense? If there's two pumps --
Let me ask a different question.
If there's two pumps here, was it at the one farther away from your car and Independence or

closer to your car and Independence?
A **I still don't understand the question. I'm sorry.**
Q It's probably the way I'm asking it.
There's two pumps at this island; right --
MR. NESLUND: Well, you were going to say something. There's probably four pumps; right?
MS. BENSON: Right.
BY MR. NESLUND:
Q All right. Was it at the pump --
Was the red car at the pump that was farther east or west?
A **I mean, where I drew the circle is almost the exact spot where the vehicle was parked.**
Q Okay. All right. And as you pulled into the gas station, were there people in the gas station when you arrived?
A **There were people spread throughout the gas station, yes.**
Q All right. Any way you can estimate how many people approximately were spread throughout

the gas station?
A **I couldn't give you an exact number. It's a busy gas station. It's parked right off the expressway.**
Q Okay. Men and women, is that fair to say?
A **Yes.**
Q All right. Okay. Once you parked the car where the box is located, what's the first thing you did?
A **Exited my vehicle.**
Q All right. And of course you knew you were looking for a red car; correct?
A **Correct.**
Q And when you exited your vehicle, you already testified but to make sure, you don't remember if you heard a phone pinging but you saw the red car?
A **I did see the red car, yes.**
Q But you're not sure if you heard the pinging?
A **At this time I don't recall if I heard the pinging or not.**
Q What did you do after you exited the

car?
A **I went to the red vehicle.**
Q All right. And when you got to the red vehicle you looked inside?
A **Yes. The windows were down so I could see inside.**
Q All right. And tell me what you saw.
A **When I first looked into the vehicle I seen a -- what I believed to be a firearm at the time. I saw two cell phones, I believe in the cup holders of the vehicle, and then I saw a purse in the vehicle.**
Q The firearm, where was that located within the vehicle?
A **It was on the passenger side of the vehicle. It was in plain view, but I don't remember -- I don't recall exactly where it was, if it was on the floor or if it was on the seat.**
Q Okay. And my client, Mr. Lloyd, where was Mr. Lloyd when you first observed him?
A **When I first observed him he was walking in the lot away from the red vehicle. And then he stopped in the middle of, I would say between the pump and where the register is for the gas**

**station.**
Q All right. Using the pen again -- or the marker, rather, can you put an X for where you first saw Mr. Lloyd approximately?
A **I would say approximately.**
**(Witness complies.)**
Q Let the record reflect Officer Pruger placed an X on Exhibit 2 in the approximate location where he first observed Mr. Lloyd.
Is that correct?
A **Correct.**
MR. NESLUND: Off the record.
(WHEREUPON, the parties went off the record.)
MR. NESLUND: Back on the record.
BY MR. NESLUND:
Q There was a green van also within the gas station?
A **Yes.**
Q All right. Using your marker can you make, like, a larger X or, excuse me, a larger box and we'll put a V in it for where you saw the van?
A **Let's see. Somewhere right in this area here (indicating).**

**(Witness complies.)**
Q Okay. Thank you.
And let the record reflect Officer Pruger has made a larger box with a V in the approximate location of the van on Exhibit 2.
Is that correct?
**A Yes.**
Q When you saw Mr. Lloyd was he --
Did he appear to you that he was walking towards that green van?
**A He was walking in the vicinity of the green van. Yes.**
Q All right. Was he closer to the van when you first saw him than he was to the red car?
**A He was closer to the red car when I initially saw him.**
Q All right. How close was he --
When you first saw him how far away or how close was he to the red car?
**A I would say approximately 10 to 15 feet.**
Q Okay. And he would have been how many feet, again approximately, to the green van when you first observed him?
**A I would say 12 to 15 feet.**

Q Okay. And you mentioned he was moving, he was walking. And then I think --
Did you say he stopped at some point?
**A I seen him walking, maybe taking -- he took maybe two or three steps and then stopped.**
Q And where you put the X, is that the approximate place where he stopped?
**A Approximately, yes.**
Q All right. And did you hear him say anything --
Again, these are your first observations of him, when he's walking these two or three steps and stops?
**A No, I did not hear him saying anything. I could see his mouth moving, but I could not hear what he was saying.**
Q Okay. Were there any individuals outside of the van when you first arrived?
**A I don't recall.**
Q Okay. You got to the red car. What did your partners, Officer Cox and Theodore, what did they do?
**A They approached Mr. Lloyd.**

Q All right. Now, before the three of you exit your car was there any communication between you and your partners regarding Mr. Lloyd?
**A Yes.**
Q All right. Tell me about that. What was said?
**A I don't recall exactly what was said other than the fact that we observed the defendant walking away from the vehicle -- from the area where the vehicle was parked, and that he fit the physical description.**
Q All right. And the physical description that we just heard was male, Black, of course, tall, lean, bald headed?
**A Yes.**
Q Okay. All right. And was he wearing this hoody that we were talking about earlier?
**A Yes.**
Q Okay. All right. So you go check out the car, you see what you believe to be the gun and the proceeds. What's the next thing you do?
**A I notify my partners of what my observations were.**
Q All right. And what did Officers Cox

and Theodore do with Mr. Lloyd?
**A I believe they detained him.**
Q All right. When you say "detained," he was handcuffed?
**A Yes.**
Q And patted down?
**A Yes.**
Q All right. Mr. Lloyd, was he placed at that time into your squad car, your undercover car?
**A He was not placed in our unmarked vehicle.**
Q Okay. Now, did other police officers, other than -- I'm not talking about the victim -- other police arrive at the gas station?
**A Yes, other officers did arrive.**
Q All right. Were these marked and unmarked cars?
**A Yes.**
Q Do you know approximately how many other officers arrived at the gas station?
**A I couldn't give you a number.**
Q All right. Officers Salgado and Ramirez, were they in an unmarked car like you and

procedure, was Mr. Lloyd ever standing alone in the middle of the lot between two squad cars with the other men behind him?
A **No.**
Q Were the other men ever in handcuffs kneeling behind Mr. Lloyd and he was the only one standing during the identification procedure?
A **No.**
Q All right. If that was done would you agree with me that would be improper and suggestive?
A **Yes.**
Q All right. Was Mr. Lloyd held by police officers by the arm at any point during the identification procedure?
A **I don't know.**
Q All right. Do you remember where Mr. Lloyd was within the line of guys?
A **I do not.**
Q Okay. And, again, if an officer was holding Mr. Lloyd and only Mr. Lloyd, would that be suggestive, kind of like letting Ms. Bridger know which guy to identify?
MS. BENSON: Objection to form, and to

the extent it calls for improper opinion.
Go ahead and answer.
THE WITNESS: I have no idea.
BY MR. NESLUND:
Q All right. In any event, Mr. Lloyd was not standing in front of the other group of men at the time of the identification procedure; correct?
A **Correct.**
Q All right. They were all lined up and, as you described, daisy-chained together?
A **Yes.**
Q Were they in a line back here, you see where this white fence is? Were they standing way back there by the white fence during the identification procedure?
A **No.**
Q You didn't speak directly with Ms. Bridger before the identification procedure; correct?
A **That is correct.**
Q All right. So bear with me to these questions. Did you ever tell Ms. Bridger before the identification procedure that the offender was already apprehended?

A **No.**
Q Did you ever tell that to Detective Pisano before the identification procedure?
A **No.**
Q Did you ever tell Ms. Bridger that the items, her property, had already been recovered?
A **No.**
Q Did you tell that to Detective Pisano, that her belongings had been recovered?
A **No.**
Q All right. And did you ever tell either Ms. Bridger or Detective Pisano before the identification procedure that the proceeds of the robbery were recovered from the van?
A **No.**
Q Did you ever tell Ms. Bridger or Detective Pisano that the weapon was recovered from the van?
A **No.**
Q To tell that to Ms. Bridger before any identification procedure would obviously be improper and suggestive; correct?
A **Yes.**
Q And false because none of that was

recovered from the van; is that correct?
A **That is correct.**
Q The other young men that were in the identification procedure, did they appear to you to be about the same height, weight, and so forth as Mr. Lloyd?
A **Approximately the same height, same weight.**
Q Okay. And I already asked, you didn't recall hairstyle?
A **No, I do not.**
Q After you're informed by Detective Pisano that there's been a positive ID of Mr. Lloyd, what happens next?
A **Mr. Lloyd is brought to the 12th District station.**
Q And who brings him in?
A **I believe myself, Officer Cox, and Officer Theodore.**
Q And then there is a transmission about --
Well, first of all, did you call in the plate on the red car to see who the owner was?

A Yes.
Q Okay. Let me play that, and just confirm for me if you hear your voice. All right. Actually, there's one I want to play for you just a little earlier. All right.
I'm going to play a portion where I think they are letting you know they are going to ping the phone to see if you can hear it ring. Let me just play this, and then I'll ask you a few questions.
(Audio playing.)
All right, let me pause it.
(Audio paused.)
And, for the record, we're at 8:02 on the counter.
BY MR. NESLUND:
Q That wasn't your voice at all; was it?
A No.
Q All right. There is a Beat there, 1106 Eddie. Were you the first car at the gas station as far as you know?
A It was myself and, I don't know. There's probably two or three other cars that arrived on scene initially. But I don't know how

many total were there through the whole incident.
Q Did other units arrive at about the same time as your car?
A Yes.
Q So this 1106 Eddie that we hear on here, that could be one of the other units at the gas station?
A Yes.
MR. NESLUND: Okay. Let me fast forward to a call for the plates. I'm going to start it at 15:40, and listen, and then I'll ask you if you recognize the voice.
(Audio playing.)
BY MR. NESLUND:
Q All right. Let me pause it at -- we're at 16:06 on the counter.
(Audio paused.)
Do you recognize whose voice that was?
A Yes.
Q Who's that?
A That is my voice.
Q Okay. All right. And can you tell me why you asked to have the plates run on the car?

A To verify the owner of the vehicle.
Q All right. And let me just flush it out a little bit. Why would that be important, to find out who actually owned the car?
A To see if the vehicle had come back to the person, to Mr. Lloyd, to see if the vehicle was stolen, also to see if we can verify who the owner is, if they were in the gas station.
Q All right. And while you were at the gas station, before you left did any woman come up to you or your partners that you saw claiming to be the owner of the red car?
A Not that I recall.
Q Okay. And when you asked to run the plate did you get information back about who the owner was?
A Yes.
Q And that was a Ms., I think Bloodsworth (phonetic). Does that sound right?
A Yes.
Q All right. Did you make any effort to contact Ms. Bloodsworth?
A No.
Q All right. Do you know if your partners

made any efforts to contact Ms. Bloodsworth?
A No, I do not.
Q Did you pass on the information regarding the owner of the car to the detectives who took over the investigation?
A I never spoke to the detectives that took over the investigation.
Q Okay. Before you leave the gas station do you speak to any other civilians that you remember, other than what we've talked about, the guys in the van, before you leave the gas station?
A No, not that I recall.
Q All right. Before we leave the gas station, what happened with the other men that were in the identification procedure with Mr. Lloyd?
A I don't know. I don't remember if I did or somebody else did, but name checks were conducted and they were released.
Q Did they leave or did they stay at the gas station while you were still there?
A I believe they stayed for a little bit. I don't recall how long, but I believe they were sticking around for a little bit.

can't tell what box it is -- underneath your name it says, Court Date. And then you wrote in, TBD, To Be Determined?
**A Yes.**
Q All right. And then your court key. And then there is a box, Date, Time Investigation Completed, and it was July 25th, 2015. That's what you wrote; correct?
**A Yes.**
Q At the time you filled this out, you didn't know what the next court date was going to be for Mr. Lloyd; is that right?
**A That is correct.**
Q Is there any time on this form that indicates, you know, what time you filled it out?
**A No.**
Q Okay. And then there is Tow Driver's information. Do you see that? That's Victor Perez?
**A Yes.**
Q All right. Is that your handwriting? Did you fill that out once you knew who the tow driver was going to be?
**A No.**

Q Do you know who filled that out?
**A I would assume Victor Perez did, but I have no idea.**
Q Okay. Isaiah Lloyd's name and address is in Box 21. Do you see that?
**A Yes.**
Q And where is his name on this, just as the arrestee?
**A Yes.**
Q You were able to verify that he did not have any ownership in the vehicle, that was Ms. Bloodsworth's; correct?
**A At that time, yes. Correct.**
Q All right. Would you expect the follow-up detectives to reach out to Ms. Bloodsworth and see what, if anything, she knew about who had permission to be in the car at the time of the robbery?
MS. BENSON: Objection; calls for speculation.
You can answer.
THE WITNESS: Yes.
BY MR. NESLUND:
Q Do you know if that was done?

**A I have no idea.**
Q All right. Okay. Let's go back to the station. You arrived, Mr. Lloyd is there, and you begin doing reports?
**A Yes, sir.**
Q What about Ms. Bridger, did she arrive at the station at some point?
**A Yes.**
Q All right. So let's talk about that. Did you speak with her?
**A I did.**
Q All right. And where did that interview take place?
**A Near the front desk of the 12th District. I don't exactly remember where.**
Q And did you speak to her alone? Were any of your partners present?
**A I don't recall if there were other officers with me.**
Q Did Ms. Bridger have her male companion with her when she was at the 12th District?
**A Yes.**
Q All right. Did you speak to him as well? Was he present for the conversation?

**A I believe I spoke to him --**
**Initially I spoke to them separately, and then I think I spoke to them together again.**
Q Okay. What did Ms. Bridger tell you as far as --
Did you ask her about how the robbery occurred?
**A I did.**
Q All right. And what did she tell you?
**A She told me that she was going to her boyfriend's house. While she was trying to open the gate to her boyfriend -- to enter her boyfriend's front porch a male Black approached her from the, I believe from the lot next to her boyfriend's building, produced a gun and demanded proceeds. I don't remember exactly what the terminology that she said he did -- that she said he said to her.**
Q So he spoke to her or demanded --
**A I don't remember exactly what she said that Mr. Lloyd said to her.**
Q But he said something --
I understand you don't recall

Whenever evidence is inventoried there is a paper trail of exactly where it goes and who possesses it; correct?

MS. BENSON: Object to foundation.

You can answer it.

THE WITNESS: Yes, I believe so.

BY MR. NESLUND:

Q Just a couple of more questions on this. Let's see. Again, the box for, Recovered From, Officer Cox put in Isaiah Lloyd. But just to be clear, that the gun itself was not found on Mr. Lloyd, it was found in the red car; correct?

**A That is correct.**

Q All right. We can put those away.

Let's talk about this Mr. Johnson guy.

(WHEREUPON, Exhibit No 8 was marked for identification and tendered to the witness.)

BY MR. NESLUND:

Q Showing you Exhibit Number 8, this is a report for an individual named Jason Johnson. It's a three-page document, Bates stamp Plaintiff's 23, 24, and 25.

Look on the last page. You and Officer Theodore are listed as the arresting officers; correct?

**A Yes.**

Q And this is an arrest that you made on -- go to Page 1 -- April 25th, 2016; correct?

**A Yes.**

Q And Mr. Johnson, if we look at the descriptors, is a male, Black, 5-11, 160 pounds, brown eyes, black hair, with a shaved hairstyle, medium complexion; correct?

**A Yes.**

Q All right. Do you know if Mr. Johnson was at the gas station back on July 24th, 2014?

**A I learned that he was at the gas station on that date from my current lawyer, Victoria, Ms. Benson.**

Q I don't want --

All right. Other than that -- and I certainly don't want to ask you about attorney-client privileged conversations.

So without telling me what you learned from your lawyer, did you see Jason Johnson at the gas station that night?

**A Not that I recall.**

Q All right. And let me show you maybe a better picture of him.

(WHEREUPON, Exhibit No. 9 was marked for identification and tendered to the witness.)

MR. NESLUND: Showing you a black and white photograph, for the record, it's Plaintiff's Bates stamp number 33. It's another picture of Mr. Johnson from a different arrest.

BY MR. NESLUND:

Q Do you see Mr. Johnson wearing a hooded sweatshirt in that photo?

**A Yes.**

Q Okay. Are you aware that Ms. Bloodsworth, the owner of the red car, testified that Mr. Johnson --

In the criminal case she testified that Mr. Johnson was actually the person who had the red car that night?

**A No, I'm not aware of that.**

Q You obviously didn't hear Ms. Bloodsworth's testimony because you were a witness yourself?

**A Correct.**

Q Okay. And we already established that you did not interview or attempt to interview Ms. Bloodsworth?

**A Correct.**

Q That would have been for the follow-up detectives; correct?

**A Yes.**

Q All right. And we already went through that it would be important to know who had permission or who was in the car that night if she knew?

MS. BENSON: Objection; form.

You can answer.

THE WITNESS: Yes.

BY MR. NESLUND:

Q By the way, on the arrest you made of Mr. Johnson it looks like it was a Class 4 narcotics case. Do you know what happened with that case, the disposition of it, I guess?

MS. BENSON: I'm going to make an objection to form. Are you talking about with the criminal or the civil case that we know is actually pending?

Independence?
MS. BENSON: Objection; calls for speculation.
You can answer.
THE WITNESS: I have no idea.
BY MR. NESLUND:
Q Did you ever talk to an evidence technician that was responding to that request but apparently went to 649 South Independence?
**A Not that I recall. No.**
Q All right. And that would just be down the block, right, 603 South Independence to 649 Independence?
**A Yes. It's the same block. It's the 600 block --**
Q There's only one BP --
I'm sorry. I didn't want to interrupt you.
**A No. There's only one gas station on that corner.**
Q In your conversations with Ms. Bridger, did she ever tell you if any of her credit cards were used at the gas station?
**A No.**

Q Do you know either way if her credit cards were utilized at that gas station?
**A I have no idea.**
Q Okay. When you observed Mr. Lloyd, going back to when you first saw him at the gas station, did he make any attempt to run or flee?
**A No.**
Q Okay. Other people at the gas station did walk off as police were arriving; is that true?
**A Yes.**
Q Okay. And as you sit here today, you don't know if that picture of that guy, Mr. Johnson, if that was one of the guys that walked off as police were arriving?
**A I don't know.**
Q In this case the identification of Mr. Lloyd was obviously critical to the prosecution; correct?
MS. BENSON: Objection to form.
You can answer.
THE WITNESS: Yes.
BY MR. NESLUND:
Q I mean, this is what they call a

single-finger -- a single witness identification; correct?
**A Yes.**
Q All right. And the identification was based on the procedure that you and your partners established at the gas station; correct?
**A Yes.**
Q If the identification was improper or suggestive, there was no other physical evidence that could connect Mr. Lloyd to the robbery; is that true?
MS. BENSON: Objection; calls for speculation.
You can answer.
THE WITNESS: Yes.
BY MR. NESLUND:
Q If Ms. Bridger was unable to make an identification, Mr. Lloyd would not have been arrested that night; is that correct?
MS. BENSON: Objection; calls for speculation.
You can answer.
THE WITNESS: That is correct.

BY MR. NESLUND:
Q At the time Ms. Bridger made the identification, it's your testimony, just to kind of wrap up, that all of the men were lined up and cuffed together; correct?
**A Yes.**
Q If Mr. Lloyd was standing between squad cars and the other members were kneeling down behind him, that would be improper and suggestive; would you agree?
MS. BENSON: I'm going to make an objection; calls for speculation, incomplete hypothetical.
You can answer.
THE WITNESS: Yes.
BY MR. NESLUND:
Q Were you present as the arresting officer at the preliminary hearing in Mr. Lloyd's case on July 31st, 2014?
**A Yes.**
Q All right. Did you watch or did you hear Ms. Bridger's testimony?
**A No.**
Q All right. Were you made aware by